IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| TRACY TODD PRESSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 19-03192-CV-S-RK-P |
| ) | |
| DARRIN REED, et al., ) | |
| ) | |
| Defendants. ) | |

## ORDER

Plaintiff brings this prisoner pro se action pursuant to 42 U.S.C. § 1983. Before the Court is Defendants' Motion for Summary Judgment. (Doc. 49). For the reasons set forth below, Defendants' motion is **GRANTED** in part and **DENIED** in part. Defendants' motion as to Plaintiff's Eighth Amendment claims is **DENIED**; Defendants' motion is **GRANTED** as to all remaining claims.

**I.  Background**

Plaintiff names as Defendants (1) Ozark County Sheriff Darrin Reed and (2) Deputy Jeff Lane. This case arises from Defendants' treatment of Plaintiff's alleged serious medical needs while he was jailed at the Ozark County Jail for approximately six weeks and from Defendant Reed's press releases regarding the events leading to Plaintiff's custody. Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment by the related actions of denying him some of his prescription medication, failing to properly administer other prescription medication, and in their slow reaction to Plaintiff vomiting bile and claiming chest pain. Plaintiff further claims that Defendant Reed defamed[1] him in violation of the Fourteenth Amendment by publishing a press release detailing the circumstances of Plaintiff's arrest and charges.

---

[1] In the complaint, Plaintiff alleges, "[Defendant] Reed put out a press release with facts from the case and false statements that I have never been charged with including child sex traficking [sic]. This is clearly a violation of my 14th Amendment right to due process and a criminal attempt to slander my name and cut off all support for me." Because Plaintiff alleges that Defendant Reed published these statements via press release, the Court construes Plaintiff's allegations generally as a claim of defamation, rather than slander, which is verbal, not written. *See infra Overcast v. Billings Mutual Ins. Co.*, 11 S.W.3d 62, 70 (2000).

Plaintiff's claims stem from the following undisputed facts:[2]

### A. Facts Relating to Plaintiff's Defamation Claim

Defendant Reed is the Sheriff of Ozark County. (Doc. 50-1 at 1). Defendant Lane is a Deputy. (Doc. 50 at 5). Plaintiff was arrested on or about October 2, 2018, by the Ozark County Sheriff's Department and confined in the Ozark County Jail until November 19, 2018. (Doc. 13 at 5; Doc. 50-3 at 1). Plaintiff then was transferred to the Greene County Justice Center after charges were filed by the U.S. Attorney's Office. (Doc. 50-2).

On October 3, 2018, a Probable Cause Statement (PCS) was filed with the Ozark County Circuit Court, alleging Plaintiff committed the offenses of Statutory Rape in the First Degree and Statutory Sodomy in the First Degree. (Doc. 50-3). Based on the PCS, on October 3, 2018, the Ozark County Prosecutor John Garrabrant filed a Felony Complaint (Case No. 18OZ-CR00397) against Plaintiff with three counts: Count I for felony statutory rape; Count II for statutory sodomy; and Count III for statutory sodomy. (Doc. 50-4).

On or about October 4, 2018, Defendant Reed issued a press release about the arrest and the facts alleged in the PCS and the Complaint to the local newspaper, which in turn distributed to various other media outlets. (Doc. 50-5). Although the October 3, 2018 PCS and Complaint appear to be public documents and not sealed, the press release contained additional information not contained in either the PCS or Complaint. Specifically, the October 4, 2018 press release contained the following: "…several more charges are expected in the future which could also involve other states… On 10-03-2018 a search warrant was executed on Mr. Presson [sic] residence and numerous items was [sic] confiscated."

As a result of the investigation of the items confiscated during the execution of the search warrant, a second PCS was filed and Prosecutor Garrabrant filed a second Felony Complaint on October 9, 2018, with the Ozark County Circuit Court, charging Plaintiff with two felony counts of possession of child pornography in Case No. 18OZ-CR00403. (Doc. 50-7 and 8). Additionally, Prosecutor Garrabrant filed an amended complaint in Case No. 18OZ-CR00397 adding five more counts. (Doc. 50-10).

On or about October 9, 2018, Defendant Reed issued a press release about 1) the new

---

[2] The Court has omitted properly controverted facts, asserted facts that are immaterial to the resolution of the pending motion, asserted facts that are not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact. For ease of analysis, the facts are presented in a different order than the claims.

charges filed against Plaintiff in Case No. 18OZ-CR00403, and 2) the additional charges filed against Plaintiff in Case No. 18-OZ-CR00397, to the local newspaper. (Doc. 50-9). The press release insinuates the October 9, 2018 PCS was not publicly available on October 9, 2018. Specifically, the press release states the probable cause affidavits "have been sealed by the courts today..." The October 9, 2018 press release contained information not contained in either the October 9, 2018 PCS or Complaint. Specifically, the October 9, 2018 press release contained the following: "There are 1000's of video that still have to be gone through with over 8,000 already tagged so we can identify more victims. We have been in contact with the Federal Bureau of Investigations as there are other states involved in this with possible trafficking of children. There are months of investigations to do. We just scratched the surface of this case." "The probable cause affidavits …(contain) horrific statements. Please say a prayer for these children."

At some point Plaintiff's criminal defense attorney filed a Motions for Gag Orders in both Case No. 18-OZ-CR00397 and Case No. 18-OZ-CR00403, but the motions were withdrawn on October 11, 2018. (Doc. 50-10; Doc. 50-11).

### B. Facts Relating to Plaintiff's Eighth Amendment Claims

When Plaintiff entered the Ozark County Jail, he had four prescription medications: Omeprazole, Ambien, Adderall, and a "muscle relaxer" for a back injury. (Doc. 13 at 5-6). Plaintiff began receiving only Omeprazole and Ambien at the jail on October 4, 2018, when Plaintiff's brother brought the medications. (Doc. 50-1 at 2).

Defendants did not provide Plaintiff his prescription for Adderall because it is "on the Ozark County Jail's controlled substance list and therefore it is not provided to any detainee pursuant to jail policy." (Doc. 50-6). Additionally, Plaintiff did not receive his prescribed muscle relaxers, and is unclear from the record why Defendants did not administer that medication. (*See* Doc. 50-14; Doc. 58 at 2; Doc. 50-1 at 2-3; Doc. 50-6 at 2-3.)[3] The record is also unclear as to what constitutes a "controlled" substance for purposes of the jail's "controlled substance" list, and why two of Plaintiff's prescription medications were allowed under the "controlled substance list" jail policy but that a third was (and possibly a fourth) were disallowed. This jail policy does not appear to be part of the record. However, in his response to Defendants' motion for summary

---

[3] Complicating that question, Defendants attach as an exhibit a journal that Plaintiff appears to claim is not authentic. Although it is not dispositive of this order, the final page references muscle relaxers: "I just took 30 sleeping pills and muscle relaxers. Now all I have to do is go to sleep. Goodbye you lonely world." (Doc. 50-12 at 34).

3

judgment, Plaintiff submitted a jail policy describing the medical screening/admission process and interview. Specifically, as to "legally prescribed medications," the policy states, "Jail staff will administer legally prescribed medications according to the directions of the prescribing physician. Jail staff will not deviate from the physician's instructions." (Doc. 58-1 at 8).[4]

Further, as to Ambien, Plaintiff alleges he was supposed to take this medicine as needed but was given too much. (Doc. 13 at 7). On this point, the record is unclear, and an inference may be drawn that Defendants administered Plaintiff's medication inconsistently with the prescription.[5] (Doc. 51-14 at 2-3). More to the point, the record does not indicate which medication was administered when; it merely reflects that "MEDS" were administered. (Doc. 50-14 at 2-3. Doc. 50-14 at 2-3; *see also* Doc. 13 at 6). Plaintiff complained on several occasions of needing treatment for his depression, which he claims resulted from the denial of Adderall and the maladministration of Ambien. (Doc. 13 at 7).

Further, in his sworn complaint, Plaintiff alleges that he was in severe pain and depressed and throwing up bile and that he repeatedly asked for his medications. (Doc. 13 at 7). He alleges after eighteen days, the pain was so severe that he believed he was suffering a heart attack. (Doc. 13 at 7). Defendant Lane responded by applying a blood pressure device, which did not work, and by placing Plaintiff in a holding cell for four hours. (Doc. 13 at 7). Plaintiff claims his pleas for help were ignored and that he was finally taken to the hospital where he was given medication for GERD. (Doc. 13 at 7).[6]

On or about November 15, 2018 (following his federal indictment), medical records reflect Plaintiff's statement that he ingested 20-30 prescription Ambien pills in an attempt to commit suicide by overdose. (Doc. 50-13 at 7). Per medical records, during his examination, Plaintiff told staff at the Ozarks Medical Center Emergency Room that he

---

[4] According to Plaintiff's screening sheet (Doc. 58-1 at 2), Plaintiff was booked as being on "no" medication. Further, an inference could be drawn from the record that the officer did not ask Plaintiff any of the medical questions, but merely made "Officer Observations." (Doc. 58-1 at 2).

[5] According to the record, Ozark County Jail administered two medications to Plaintiff: "Omeprazo[le]" and "Ambien" with a frequency of "1." (Doc. 50-14 at 1). The dates and times of the record indicate that the Plaintiff was given "MEDS" as frequently as three times per day on two occasions. (Doc. 15-14 at 3). The record also shows that the Plaintiff was not given any medication on three days. (Doc. 15-14 at 2). The notation of "MEDS" does not specify which medications were given at which times. (Doc. 15-14 at 2-3).

[6] Although the hospital records relating to the overdose of medication are included as an attachment in Defendants' motion for summary judgment, records relating to the hospital visit for the cardiac pain are not. Thus, it is unclear whether there was any evaluation for mental health or any recommendation concerning mental health at that point or reconsideration of Plaintiff's prescription needs.

4

> took about 20-30 pills. He states that he collected this [sic] pills over the loss [sic] several weeks in order to have enough to kill himself. It happened several hours prior to the ED visit. He reports that he tried to kill himself. He also reports that he tried to hurt himself by hitting his head to the wall.

(Doc. 50-13 at 7). While at the emergency room, "the patient tried to hurt himself again by throwing himself from the bed. He fell on the ground. He was taken to the radiology again and a new CT of the brain was done which was negative." (Doc. 50-13 at 7).

Because of Plaintiff's suicide attempt, medical professionals discontinued his prescription for Ambien due to overdose and recommended a different medication for depression and insomnia as well as outpatient mental health medication/management. (Doc. 50-13 at 14; *see also* Doc. 50-14 at 1). Medical professionals further recommended that "patient be maintained on suicide precautions while incarcerated and that mouth checks be done after medication administration to ensure compliance rather than cheeking[7] medication." (Doc. 50-13 at 14).

Plaintiff was held at the hospital overnight, then returned to the jail on November 16, 2018, at 10:30 p.m. (Doc. 50-2). As noted above, three days later, he was transferred to another county jail. (Doc. 50-2).

Further facts are set forth as necessary.

## II. Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a movant is entitled to summary judgment on a claim only if he has made a showing that "there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law." *Van Wyhe v. Reisch*, 581 F.3d 639, 648 (8th Cir. 2009); *Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 884-85 (8th Cir. 2009). In applying this standard, the Court must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Recio v. Creighton Univ.*, 521 F.3d 934, 938 (8th Cir. 2008) (citation omitted). The inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In resisting summary judgment, the nonmoving party may not rest on the allegations in its

---

[7] Based on the record, "cheeking" appears to occur when someone secrets a pill in his/her cheek to save the pill. (Doc. 50-13 at 16.)

5

pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); *see also Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment). An "adverse party may not rely merely on allegations or denials but must set out specific facts – by affidavits or other evidence – showing [a] genuine issue for trial." *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (citing Fed. R. Civ. P. 56(e)). In so doing, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted).

Finally, Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Although discovery need not be complete before a case is dismissed, summary judgment is proper only if the nonmovant has had adequate time for discovery." *Robinson v. Terex Corp.,* 439 F.3d 465, 467 (8th Cir. 2006) (citing *Pony Computer, Inc. v. Equus Computer Sys. of Mo., Inc.*, 162 F.3d 991, 996 (8th Cir. 1996)).

### III. Civil Rights Claims

Against both Defendants Reed and Lane, Plaintiff alleges a violation of the Eighth Amendment for deliberate indifference to serious medical needs relating to prescription medication, and response to vomiting, pain, and cardiac concerns. Against Defendant Reed alone, he alleges a violation of the Fourteenth Amendment for what the Court construes as defamation. Defendants argue they are entitled to summary judgment because Plaintiff cannot establish an Eighth Amendment violation or Fourteenth Amendment violation. Defendants additionally argue that they are protected by qualified immunity.

By way of overview, § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

This statute was designed to provide "a broad remedy for violations of federally protected

civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). However, § 1983 provides no substantive rights. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). "[O]ne cannot go into court and claim a 'violation of § 1983' – for § 1983 by itself does not protect anyone against anything." *Id.* Rather, § 1983 provides a remedy for violations of the "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." § 1983; *see also Albright*, 510 U.S. at 271 (stating that § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred'"); *Graham*, 490 U.S. at 393-94 (same); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) (noting that the phrase "Constitution and laws" means that § 1983 provides remedies for violations of rights created by federal statutes, as well as those created by the Constitution). Thus, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution [or] laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Van Zee v. Hanson*, 630 F.3d 1126, 1128 (8th Cir. 2011) ("To state a claim under § 1983, a plaintiff must allege (1) that the defendant acted under color of state law, and (2) that the alleged conduct deprived the plaintiff of a constitutionally protected federal right").

In response to a § 1983 claim, a defendant may assert the defense of qualified immunity, as Defendants have done here. The Eighth Circuit has explained that:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense.

*Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (citations omitted). "The defense of qualified immunity gives government officials engaged in discretionary activities immunity from liability unless their conduct violates 'clearly established statutory or constitutional rights.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Officials are entitled to qualified immunity only to the extent that 'their conduct does not violate clearly established

7

statutory or constitutional rights of which a reasonable person would have known.'" *Hedges v. Poletis*, 177 F.3d 1071, 1074 (8th Cir. 1999) (quoting *Harlow*, 457 U.S. at 818). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It protects government officials from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (quotation omitted). Put another way, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (internal quotations omitted). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* (quoting *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004)) (internal quotation marks omitted).

The Court uses a two-part test to determine whether a government official is entitled to qualified immunity. *See Branch v. Gorman*, 742 F.3d 1069, 1072 (8th Cir. 2014). The first part of this test is to determine "whether the facts alleged, construed in the light most favorable to [Plaintiff], established a violation of a constitutional or statutory right." *Id.* The second part of this test is to determine "whether that right was clearly established at the time of the alleged violation, such that a reasonable officer would have known his actions were unlawful." *Id.*

### A. Eighth Amendment Claims

#### 1. At this juncture, Defendants Reed and Lane are not entitled to judgment as a matter of law as to Plaintiff's claim concerning serious medical needs

Plaintiff alleges Eighth Amendment violations relating to how his prescription medications were administered while confined at the Ozark County Jail. Specifically, Plaintiff makes the related claims that he was denied his prescription drug Adderall and muscle relaxer, that his Ambien was administered contrary to the prescription, and that Plaintiff was in pain/throwing up bile, leading to a hospitalization for a possible cardiac emergency. Also, Plaintiff suffered from depression and attempted suicide while incarcerated.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII.[8] "Deliberate indifference to the serious medical needs of a prisoner

---

[8] Generally, a pretrial detainee's civil rights claim must be analyzed under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment. *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007). However, "[p]risoners and pretrial detainees are protected under the Constitution from a state actor's deliberate indifference

8

constitutes cruel and unusual punishment . . . and the Constitution prohibits state governments from inflicting such punishments." *Merlin v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976)). "A prima facie case alleging such deliberate indifference requires the inmate-plaintiff to demonstrate that he suffered from an objectively serious medical need and that prison officials actually knew of, but deliberately disregarded, that need." *Meuir v. Greene Cnty. Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007) (citation omitted). The plaintiff-inmate must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded the inmate's needs by administering an inadequate treatment. *Id*.

Put another way, to establish a claim for deliberate indifference, a plaintiff must show that: (1) he suffered objectively serious medical needs, and (2) prison officials actually knew of but deliberately disregarded those needs. *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle*, 429 U.S. at 105 (1976) (additional citation omitted)).

### a. *Serious Medical Needs*

As to the first prong, a serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)). A jury may find a prison official knew of a prisoner's serious medical needs from circumstantial evidence, such as "the fact that the needs were obvious." *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995).

In his complaint, Plaintiff makes sworn statements concerning his prescriptions, mental health, and his pain and vomiting. Defendants' motion does not meaningfully controvert those sworn statements so as to take the matter outside the purview of the fact-finder. Further, the duty to provide medical care extends to mental health needs, and Plaintiff's claims here indicate he was not provided or was mis-provided prescriptions addressing his mental health. *Smith v. Jenkins*, 919 F.2d 90, 9293 (8th Cir. 1990) (reversing summary judgment where jail physician decided

---

towards the inmate's serious medical needs." *Corwin v. City of Independence, Mo.*, 829 F.3d 695, 698 (8th Cir. 2016). In this vein, the Eighth Circuit recognizes that "the same standard of care is appropriate" for both convicted inmates and pretrial detainees; the Eighth Amendment's protections from "deliberate indifference to a prisoner's serious medical needs" applies to both classes upon "claims that prison officials unconstitutionally ignored a serious medical need or failed to protect the detainee [or inmate] from a serious risk of harm." *Butler v. Fletcher*, 465 F.3d 340, 344-45 (8th Cir. 2006); *see Kahle*, 477 F.3d at 550 (the pretrial detainee-convicted inmate distinction "makes little difference as a practical matter" in this context).

inmate did not require psychiatric drugs based on multiple disputed facts); *see also Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995) (holding that "[p]rison staff violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious mental-health-care needs."); *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002) (citations omitted) (holding that the "duty to provide medical care encompasses detainees' psychiatric needs").

Thus, Plaintiff's undisputed allegations that he was denied or maladministered his psychiatric medications (and possibly muscle relaxers) along with his allegations of untreated pain and vomiting present at least a triable issue as to the first prong of the test.[9]

### b. *Deliberate Indifference*

The Court turns to the second prong, whether Defendants actually knew of but disregarded that need. "Deliberate indifference entails a level of culpability equal to the criminal law definition of recklessness: disregarding a known risk to the inmate's health." *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015). "Deliberate indifference may include intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed." *Pietrafeso v. Lawrence Cty.*, 452 F.3d 978, 983 (8th Cir. 2006) (quoting *Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995)). "Deliberate indifference is 'more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Fourte v. Faulkner Cnty, Ark.*, 746 F.3d 384, 387 (8th

---

[9] Defendants are correct that, generally, an inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to serious medical needs. *Coleman*, 117 F.3d at 784; *Crowley v. Hedgepath*, 109 F.3d 500, 502 (8th Cir. 1997) (affirming summary judgment where nonmovant "failed to submit verifying medical evidence that delay in the provision of sunglasses had any adverse effect on his prognosis"). The Court finds this argument inapposite here for two reasons.

First, particularly as to medications, it does not appear the Plaintiff is alleging an Eighth Amendment violation based on a delay in treatment; rather, he alleges an Eighth Amendment violation concerning the maladministration of Ambien and the complete lack of administration of Adderall and muscle relaxers, drugs for which he had prescriptions prior to his incarceration. Second, even assuming the need for verifying evidence applies under these circumstances, "a need for medical attention that would have been obvious to a layperson [makes] submission of verifying medical evidence unnecessary." *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004) (holding that no affidavit was necessary where inmate presented evidence that he suffered extreme pain from loose and infected teeth, which caused blood to seep from his gums, swelling, and difficulty eating and sleeping); *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995) (holding that serious medical need is one that is either obvious to a layperson or supported by medical evidence).

Here, the fact that Plaintiff was prescribed medications and that some or all of the prescription medications were presented to the jail shortly after Plaintiff's arrival at the jail along with Plaintiff's complaints of pain and vomiting at least creates a triable issue that Plaintiff has a need or needs "diagnosed by a physician as requiring treatment," *see Coleman*, 117 F.3d at 784, or one or more needs obvious to a layperson or supported by medical evidence. *See Aswegan*, 49 F.3d at 464.

Cir. 2014) (quotation omitted). "A prison official is deliberately indifferent to a prisoner's serious medical needs *only if* he is 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Pietrafeso*, 452 F.3d at 984 (emphasis added) (quoting *Farmer*, 511 U.S. at 837). However, the deliberate indifference standard "is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *Hudson v. McMillian*, 503 U.S. 1, 6 (1992).

Here, viewing the facts in the light most favorable to Plaintiff, the claims are that Defendants were deliberately indifferent by "den[ying] my medication that were prescribed by my doctor for a serious medical need and forcing me to take medication not as proscribed [sic]." (Doc. 13 at 9). Further, Plaintiff alleges that he suffered pain and vomiting that went unaddressed for days or weeks until Plaintiff believed he was suffering a heart attack. (Doc. 13 at 7).

Turning to the record, it is undisputed that Plaintiff was arrested and confined in the Ozark County Jail on October 2, 2018, and began receiving some of his prescription medications there on October 4, 2018, after Plaintiff's brother brought the medications to the jail. (Doc. 50-1 at 2). Beginning that day, Defendants administered two of the three or four medications for which Plaintiff had a prescription and for which Plaintiff's brother proffered the medication to Defendants: Omeprazole and Ambien. (Doc. 50-1 at 2-3; Doc. 50-14; Doc. 50-6 at 2-4). Medication logs reflect that Defendants generally provided Plaintiff these medications at least once daily, though on some days (November 8, 15, and 16), the record appears to indicate that the medications were not provided at all. (Doc. 50-14). However, Defendants are clear that they did not provide Plaintiff his prescription for Adderall pursuant to a jail policy prohibiting "controlled substances." (Doc. 50-6 at 2). The particular policy is not a part of the record, and it is unclear why one or more of Plaintiff's prescriptions qualify as "controlled substance" that cannot be administered while other prescription medication may be administered. It is additionally unclear whether Plaintiff was provided muscle relaxers (If they were not provided, it is unclear why they were withheld.).

Further, Plaintiff's sworn complaint includes allegations that he requested his medication multiple times from Defendants but that he was never provided all of his prescription medications throughout his stay at the jail. (Doc. 13 at 6-9). Plaintiff further alleges he was provided Ambien

11

more or differently than prescribed, and there is no dispute that Defendants did not provide Adderall (and possibly muscle relaxers) at all during the course of Plaintiff's incarceration in the Ozark County Jail despite the uncontested fact that Plaintiff had a physician's prescription.

Plaintiff was admitted to a hospital on October 17, 2018, after complaints of vomiting bile and chest pain, and on November 15, 2018, due to an Ambien overdose. (Doc. 50-13 at 7). Although the record does not include hospital records relating to the first admission, according to the medical records documenting the second visit, Plaintiff told the treating medical professional that he took between twenty and thirty Ambien pills, which he collected over several weeks and took all at once in an attempt to kill himself. (Doc. 50-13 at 7). Plaintiff alleges Defendants' improper administration of Ambien and Defendants' failure to provide him Adderall led to his suicide attempt. (Doc. 13 at 8). The Court finds Plaintiff's allegations – along with (1) the jail policy of not providing an inmate certain medications that were prescribed prior to incarceration without any independent medical assessment,[10] and (2) jail medication logs indicating Plaintiff never received muscle relaxers and was administered Ambien contrary to recommended dosages – sufficient to withstand Defendants' motion for summary judgment.

In sum, it is undisputed that when Plaintiff entered the jail, he had numerous prescription medications. Plaintiff's brother brought some or all of those medications to the jail two days after Plaintiff was incarcerated. Nonetheless, despite a doctor's prescription, Defendants declined to provide Plaintiff his Adderall, citing a jail "policy" against "controlled substances."[11] The fact

---

[10] Notably, it is not the case that the record shows jail doctors disagreed with previous prescriptions; rather, as best as can be discerned, at least one of Plaintiff's prescriptions was discontinued and another medication's dosage was altered without professional medical judgment informing Defendants' (non-medical jail officials') decision to do so. *Cf. Pietrafeso*, 452 F.3d at 983 (jailer was not deliberately indifferent where undisputed evidence showed he "went to great lengths to have [detainee's] prescriptions filled" and that he "trying to treat [her asthma] attack, not ignore it"); *Vaughan v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995) (inmate who showed prison doctors disagreed with medications given prior to incarceration showed no more than disagreement with proper course of treatment, and does not support a conclusion that the prison's treatment was unreasonable); *Logan v. Clarke,* 119 F.3d 647, 649–50 (8th Cir.1997) (prison doctors were not deliberately indifferent where they treated prisoner on numerous occasions and offered sensible medication and treatment).

[11] In so ruling, the Court finds Defendants' argument that they are entitled to judgment as a matter of law because they followed jail policy unpersuasive. *See Dadd v. Anoka Cnty.*, 837 F.3d 749, 756 (8th Cir. 2016) (holding that failure to distribute plaintiff's Vicodin prescription despite awareness of it and plaintiff's pain constituted deliberate indifference); *Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 796 (8th Cir. 2006) ("[T]he knowing failure to administer prescribed medicine can itself constitute deliberate indifference"); *see also Strahan v. Rottnek*, No. 4:13-cv-448 SNLJ, 2015 WL 249448 (E.D. Mo. Jan. 20, 2015) ("Because Dr. Rottnek's policy was applied to plaintiff without any medical determination regarding plaintiff's medical need for narcotic prescription medication for his chronic pain, the policy had the effect of denying plaintiff medical treatment"); *McAdoo v. Martin*, 899 F.3d 521 (8th Cir. 2018) (affirming the lower court's finding that the defendants, by acting pursuant to a blanket policy denying prisoners the right to narcotic pain medication even when prescribed, where "[n]o assessment of [plaintiff's] pain level

that Defendants, who are not medical personnel, substituted their policy and their schedule for administering medication for that of a treating physician, without more, at least creates a triable issue as to whether Defendants were deliberately indifferent to Plaintiff's serious medical needs. Furthermore, the record supports an inference that Defendants did not administer Plaintiff's prescription muscle relaxers, and Defendants offer no evidence supporting why they did not administer that prescription. Finally, a fact-finder could infer that Defendants administered Ambien contrary to the recommended dosage. These disputed facts – taken together with those regarding the lack of Adderall and allegations of unaddressed pain and vomiting – create a triable issue as to whether Defendants acted with deliberate indifference.

### 2. At this juncture, Defendants are not entitled to Qualified Immunity

Defendants claim they are entitled to qualified immunity. As set out above, the record contains genuine issues of material fact as to whether Defendants were deliberately indifferent to Plaintiff's serious medical needs. The Court next considers whether the rights Plaintiff asserts were "clearly established at the time of the alleged violation, such that a reasonable officer would have known that [his] actions were unlawful." *Clayborn*, 734 F.3d at 809.

"Although the defendant bears the burden of proof for this affirmative defense [qualified immunity], the plaintiff must demonstrate that the law was clearly established." *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) (alteration added). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation and

---

was attempted [and no] medical judgment was exercised, were deliberately indifferent); *see Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989) (reversing summary judgment where there was "no affidavit filed by any physician or medical director which contradicts plaintiff's need for pain medication"; material issue of fact remained as to whether policy contributed to denial of pain medication).

    The Court also notes that the Ozark County Sheriff's Department Jail Manual as provided in the record does not show the prohibition of Adderall because it is a "controlled substance." (Doc. 58-1). Rather, as noted above, the Manual includes the following provision to the contrary: "Medications: Jail staff will administer legally prescribed medications according to the directions of the prescribing physicians. Jail staff will not deviate from the physician's instructions." (Doc. 58-1 at 8). Typically an official's failure to follow jail policy does not create a constitutional violation. *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) ("There is no federal constitutional liberty interest in having state officers follow state law or prison officials follow prison regulations . . . . Rather, any liberty interest must be an interest in the nature of the prisoner's confinement, 'not an interest in the procedures by which the state believes it can best determine how he should be confined'") (quoting *Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir. 1996)). However, here, Defendants admit that they had a blanket policy to deny "controlled substances" including Adderall, and to the extent that policy was unwritten but still implemented as jail policy, the Court finds there to be a genuine, triable issue of fact in determining whether that action constituted deliberate indifference to Plaintiff's serious medical needs for the reasons set forth herein.

13

alterations omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* In other words, "clearly established law is 'dictated by controlling authority or a robust consensus of cases of persuasive authority.'" *Lane v. Nading*, 927 F.3d 1018, 1022 (8th Cir. 2019) (citing *District of Columbia v. Wesby*, 138 S. Ct. at 589.

Here, it is plain that a pretrial detainee has a constitutional right to adequate medical care, including prescription medication. *Dadd v. Anoka Cnty.*, 837 F.3d 749, 757 (8th Cir. 2016) (citing *West v. Atkins*, 487 U.S. 42, 55 (1988) (holding that failure to distribute plaintiff's Vicodin prescription despite awareness of it and plaintiff's pain constituted deliberate indifference); *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1155 (6th Cir. 1991) (holding that nurse's failure to administer inmate's readily available prescription pain medication for a wound constituted deliberate indifference); *cf. Jackson v. Reid*, No. 16-2405, 2018 WL 550797 (D. Minn. Jan. 25, 2018) (finding that, despite not providing plaintiff his prescription antidepressant, defendants were not deliberately indifferent because they had "no reason to 'be aware of facts' suggesting that 'a substantial risk of serious harm' existed" where plaintiff alleged that he suffered only one night and that he asked for his Zoloft just twice but otherwise did not allege that he suffered symptoms after various other instances of being denied the prescription) (citing *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004)).

In short, Defendants had fair warning about the unconstitutionality of the failure to provide prescription medication without some sort of medical assessment and of obvious and untreated pain.[12] *Id.*; *see also Boretti*, 930 F.2d at 1155; *Ashcroft*, 563 U.S. at 741; *Johnson v. Carroll*, 658 F.3d 819, 828 (8th Cir. 2011) ("Although earlier cases need not involve fundamentally or materially similar facts, the earlier cases must give officials fair warning that their alleged

---

[12] To the contrary, the record allows for the inference that Defendants did not follow their own protocol required by their Jail Manual. (Doc. 58-1 at 6-8). "During the admissions/booking process, the jail officer shall conduct a medical screening of all persons to be admitted . . . . The medical screening process consists of a questions and answer interview." (Doc. 58-1 at 6). "The jail officer shall ask the inmate a series of questions about the inmate's medical history and then record the inmate's answer on the appropriate forms." (Doc. 58-1 at 7). "Jail staff will administer legally prescribed medications according to the directions of the prescribing physician. Jail staff will not deviate from the physician's instructions." (Doc. 58-1 at 8).

14

treatment of the plaintiff was unconstitutional").

### B. Defendant Reed is entitled to judgment as a matter of law as to Plaintiff's Fourteenth Amendment claim

Plaintiff alleges that Defendant Reed violated his right to due process under the Fourteenth Amendment by issuing a press release containing facts from the case and false statements about him.

A violation of procedural due process occurs when a plaintiff has a life, liberty, or property interest, and the state deprives him of that interest without sufficient process. *Krentz v. Robertson*, 228 F.3d 897, 902 (8th Cir. 2000). The Supreme Court has held that "injury to reputation by itself was not a 'liberty' interest protected under the Fourteenth Amendment." *Siegert v. Gilley*, 111 S.Ct. 1789, 1794 (1991) (citing *Paul v. Davis*, 424 U.S. 693, 708-09 (1976)). Indeed, "A person's reputation, alone, is not a protected liberty or property interest." *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013).

A substantive due process claim must show that "the government action complained of is truly irrational, that is something more than arbitrary, capricious, or in violation of state law. Truly irrational conduct is conscience shocking in a constitutional sense." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (quotations and citation omitted). This is a high standard, and, as such, the Supreme Court has consistently "rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct . . . ; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). Finally, "because the conscience-shocking standard is intended to limit substantive due process liability, it is an issue of law for the judge, not a question of fact for the jury." *Sitzes v. City of West Memphis Ark.*, 606 F.3d 461, 467 (8th Cir. 2010).

Here, Plaintiff's Fourteenth Amendment claim that Defendant Reed violated his right to due process by publishing information about the investigation and charges against Plaintiff fails for two reasons: first, Plaintiff does not have a protected interest in his reputation, and second, Plaintiff has not demonstrated that Defendant Reed's conduct in publishing the information was irrational or conscience shocking. In their reply brief, Defendants state

> Plaintiff also repeatedly misstates Sheriff Reeds [sic] press releases, *e.g.* Exhibit I, and argues Sheriff Reed stated Presson was charged with "trafficking of children." Sheriff Reed made no such statement to the press. What Sheriff Reed did report

15

> was the Federal Bureau of Investigation had indicated to him it had investigations of plaintiff in other states "with possible trafficking of children." That is not only a true statement but bore out in the subsequent federal charges filed against Presson which ultimately resulted in his guilty plea to felony sexual exploitation and enticement of a child as well as the production of child pornography.

(Doc. 59 at 4). Plaintiff has presented no evidence showing that Defendant Reed published any statement claiming that Plaintiff was trafficking children. Moreover, the record reflects that the complained of press release – the only reference to "trafficking of children" in the entire record apart from Plaintiff's unsupported allegations – merely states, "We have been in contact with the Federal Bureau of Investigations as there are other states involved in this with possible trafficking of children." (Doc. 50-9).[13] While Plaintiff appears to take issue with Defendant Reed including the phrase "possible trafficking of children" in the press release when Plaintiff had not been charged with that offense, at best, his claim suggests Defendant Reed's characterization of Plaintiff's connection to "possible trafficking of children" in the press release was negligent, which is insufficient to state a constitutional claim. *See Sitzes*, 606 F.3d 466 ([N]egligent conduct . . . is categorically beneath the threshold of constitutional due process") (quotation omitted).

Defendant Reed thus correctly contends that he is protected by qualified immunity because Plaintiff failed to demonstrate a violation of the Fourteenth Amendment. Even assuming a violation of Plaintiff's due process rights, Plaintiff cannot demonstrate that the alleged constitutional violation was clearly established at the time of Defendants' conduct such that every reasonable official would have understood that their actions violated those rights. *See Branch*, 742 F.3d at 1072. Therefore, Plaintiff's Fourteenth Amendment claim fails also under the second qualified immunity prong.

Because Defendant Reed is protected by qualified immunity on Plaintiff's Fourteenth Amendment claim, Defendant Reed is entitled summary judgment as a matter of law as to this claim.

## IV. State Law Claim of Defamation

To the extent Plaintiff alleges defamation against Defendant Reed, independent of his due process rights under the Fourteenth Amendment, the Court notes that such a claim is strictly a

---

[13] The Court takes judicial notice of *United States v. Presson*, No. 6:18-cr-03128-SRB-1. Charges in the Superceding Indictment include two counts of Sexual Exploitation of Children, one count of Coercion or Enticement of Female/Male, four counts of Coercion or Enticement of Minor, one count of Sexual Exploitation of Minors, and one count concerning Registration of Firearms. No. 6:18-cr-03128-SRB-1 at Doc. 23-1.

matter of state law. *Paul*, 424 U.S. at 709 ("Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation"); *Miner v. Brackney*, 719 F.2d 954, 955 (8th Cir. 1983) ("Claims for defamation and slander are not cognizable under § 1983 . . . words and intents do not rise to the level of constitutional deprivations") (internal citations and quotations omitted).

Liberally construed, that claim is raised here under the federal supplemental jurisdiction statute, 28 U.S.C. § 1367(a). That statute provides:

> In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

*Id.* "Claims within the action are part of the same case or controversy if they 'derive from a common nucleus of operative fact.'" *Myers v. Richland County*, 429 F.3d 740, 746 (8th Cir. 2005) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). "A plaintiff's claims derive from a common nucleus of operative fact if the 'claims are such that he would ordinarily be expected to try them all in one judicial proceeding.'" *OnePoint Solutions, LLC v. Borchert*, 486 F.3d 342, 350 (8th Cir. 2013) (quoting *Gibbs*, 383 U.S. at 725).

Here, Plaintiff's remaining federal question claim under the Eighth Amendment and state law claim for defamation arose from the same set of facts and would ordinarily be expected to be tried together. *See id.* Therefore, the district court has supplemental jurisdiction over his state law claim.

"The elements of defamation in Missouri are: 1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation." *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 70 (Mo. banc 2000). "In any defamation case, the truth of the allegedly defamatory statement may be submitted as evidence, Mo. Const. art. I, § 8, . . . mean[ing] that the truth is an *absolute* defense to a defamation claim." *Nigro v. St. Joseph Med. Ctr.*, 371 S.W.3d 808, 818 (Mo. App. W.D. 2012) (citing *Rice v. Hodapp*, 919 S.W.2d 240, 243-44 (Mo. banc 1996)). The test for the defense of truth is "whether the challenged statement is substantially true." *Id.* (citation omitted). "It is not necessary that the precise facts disclosed be literally true. Slight inaccuracies are immaterial if the allegedly defamatory charge is true in substance." *Id.* (citations omitted).

As set forth above, Plaintiff alleges Defendant Reed defamed him by publishing

17

information about the charges and federal investigation of those charges, including the phrase "possible trafficking of children." (Doc. 50-9). Turning to the record, it is undisputed that on October 9, 2018, Sheriff Reed issued a press release pertaining to the facts alleged in the complaint, which is a public documents. (Doc. 50-9).

Plaintiff alleges that there was never any charge brought relating to child trafficking or sex trafficking, and for this reason, Defendant Reed had no true basis on which to state that "there are other states involved in this with possible trafficking of children." (Doc. 58 at 2; Doc. 60 at 1; Doc. 50-9). However, his contention is plainly contradicted by the record – specifically, the Probable Cause Statements (Docs. 50-3 and 50-7) and the Superceding Indictment in the federal criminal case against Plaintiff (*United States v. Presson*, No. 6:18-cr-03128-SRB-1 at Doc. 23-1). The Probable Cause Statements state that Plaintiff "purchased a motel room in the State of Kansas . . . [and] made [his stepdaughter, a juvenile] have sexual intercourse with him," demonstrating that Defendant Reed's statement in the press release that "there are other states involved" is at least substantially true. (Doc. 50-7 at 1; Doc. 50-3 at 1). Furthermore, the Superceding Indictment indicates that Plaintiff has been charged with two counts of violating 18 U.S.C. 2251(a) and (e): "engag[ing] in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, which visual depiction was produced using materials that had been mailed, shipped, and transported in interstate and foreign commerce," the investigation of which would involve the *possibility* of child sex trafficking.[14] Thus, Defendant Reed's publication of the phrase "*possible* trafficking of children," is at least substantially true. (Doc. 50-9) (emphasis added).

Because Plaintiff's contention that the information Defendant Reed published was defamatory is contradicted by the record, which indicates the published statements were true or substantially true, and because Plaintiff provides no additional probative evidence or affidavits to support his contention, his defamation claim cannot survive summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which

---

[14] A person engages in sex trafficking of children if he "knowingly (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." 18 U.S.C. § 1591. "The term 'commercial sex act' means any sex act, on account of which anything of value is given to or received by any person. 18 U.S.C. §1591(e)(3). "Producing a visual depiction of such [sexually explicit] conduct," 18 U.S.C. § 2251(a), raises the possibility that Plaintiff might be involved in the sale of that depiction or otherwise receive anything of value in exchange for it. Thus, Defendant Reed's characterization of the federal investigation into the events giving rise to the charges in the Superceding Indictment as involving "possible child trafficking" is substantially true.

is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"); *see also RSBI Aerospace, Inc.*, 49 F.3d at 402.

Thus, because there are no issues of genuine fact and Defendant Reed has established that his statements were true or substantially true – an absolute defense to a defamation claim – Defendant Reed is entitled to summary judgment as to this claim.

## V. NOTICE CONCERNING $505 APPELLATE FILING FEE

Plaintiff is advised that if he appeals any portion of this order, in addition to the $350 filing fee, federal law "makes prisoners responsible for [appellate filing fees of $505] the moment the prisoner . . . files an appeal." *Henderson v. Norris*, 129 F.3d 481, 483 (8th Cir. 1997) (citation and quotation omitted). Pursuant to *Henderson*, Plaintiff is notified as follows:

> (a) the filing of a notice of appeal by the prisoner makes the prisoner liable for payment of the full . . . appellate filing fees regardless of the outcome of the appeal; (b) by filing a notice of appeal the prisoner consents to the deduction of the initial partial filing fee and the remaining installments from the prisoner's prison account by prison officials; (c) the prisoner must submit to the clerk of the district court a certified copy of the prisoner's prison account for the last six months within 30 days of filing the notice of appeal; and (d) failure to file the prison account information will result in the assessment of an initial appellate partial fee of $35 or such other amount that is reasonable, based on whatever information the court has about the prisoner's finances.

*Id*. at 484.

## VI. CONCLUSION

Defendants' motion for summary judgment (Doc. 49) is **GRANTED** in part and **DENIED** in part. Defendants' motion as to Plaintiff's Eighth Amendment claims is **DENIED**; Defendants' motion is **GRANTED** as to all remaining claims.

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

Dated: October 5, 2020